WESTINGHOUSE ELECTRIC & MFG. CO. v. ALLIS-CHALMERS CO.

(Circuit Court, D. New Jersey. May 24, 1910.)

1. PATENTS (§ 328*)—VALIDITY—INFRINGEMENT—ELECTRIC RAILWAY MOTOR.
   The Schmid patent, No. 609,977, for an electric railway motor, one of the principal features of which is the facility afforded for inspection and removal of the parts for repair, and another that the field-magnet is made to inclose and protect the armature, and itself to constitute the support for the armature bearings, was not anticipated, and discloses invention and utility; also *held* infringed by defendant.

2. PATENTS (§ 328*)—INFRINGEMENT—ELECTRIC RAILWAY MOTOR.
   The Short patent, No. 546,560, for an electric locomotive, construed, and *held* not infringed.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Allis-Chalmers Company. Decree in part for complainant, and in part for defendant.

Richardson, Herrick & Neave, W. K. Richardson, and Harrison F. Lyman, for complainant.

Thomas F. Sheridan, Clifton V. Edwards, and Lawrence K. Sager, for defendant.

CROSS, District Judge. The record contains two patents for consideration, both of which are alleged to have been infringed by the defendant. The defendant asserts the invalidity of both patents, but, if valid, denies that it has infringed them. The first to be considered is No. 609,977, issued August 30, 1898, to Albert Schmid, assignor to the Westinghouse Electric & Manufacturing Company, for an electric railway motor. The inventor sets forth the objects of his invention in the following language:

"Another object of my invention is to supply a novel form of separable field-magnet admitting of complete protection and inclosure of the armature and at the same time of ready access to the interior parts of the field-magnet itself.

"Another object of my invention is the provision of a form of motor wherein the field-magnets may be readily inspected and repaired without the removal of the armature from the motor and car, either side of the separable field-magnet being thus capable of inspection and repair.

"By the use of my invention, I am further able to dispense with all frame-

work, except that necessary for the carrying of the reduction-gears, to cheapen the construction, and to gain certain other advantages more fully set out hereinafter."

The patent contains eight claims, but five of which are in issue, namely, Nos. 1, 2, 3, 4, and 6. They are as follows:

"1. In a railway motor, the combination with an armature of a field-magnet constructed in two sections, the upper section being supported by the car truck and the lower section being hinged to and supported by the upper section and adapted to swing downward, substantially as and for the purpose set forth.

"2. In a railway motor, the combination with an armature, of a field-magnet constructed in two sections, the upper section being spring-supported on the car truck, and the lower section being hinged to and supported by the upper section and adapted to swing downward, substantially as and for the purpose set forth.

"3. In an electric car, a motor having a horizontally-divided field-magnet, one member of which is sleeved at one end upon an axle of the car, the other member being hinged to the first-named member at one end and removably fastened thereto at its other end independently of the axle-bearing, substantially as described.

"4. An electric motor, having a horizontally-divided field-magnet, the upper portion of which is provided with an axle-bearing at one end and the lower portion of which is hinged to said upper portion, independently of said axle-bearing, whereby it may be swung downwardly without disturbing said bearing."

"6. In a motor for electric cars, the combination with the armature, of a field-magnet comprising an upper section supported by the car truck and a lower section hinged to said upper section, and means whereby the armature may be supported by either section when the lower section is swung downward, substantially as described."

The several claims, although expressed in somewhat technical language, are easily comprehended. A motor of the character in question necessarily consists of a field-magnet and an armature. The electro field-magnet is stationary, having its poles surrounded by coils of copper wire, within which poles a cylindrical shaped armature is revolved. The armature carries a series of conductors on its circumference, and, as these conductors are energized by the electric current, each conductor in succession is attracted or repelled by the poles of the magnet, whereby the armature is caused to rotate, and such rotation communicated through gearing to the axle of the car. Motors used in the propulsion of street cars manifestly require frequent inspection, and one of the main objects of this patent was to permit the making of a thorough and yet comparatively expeditious and inexpensive inspection of the magnet, the poles and coils and armature, without disconnecting them, as a whole or in part; and, furthermore, if such inspection revealed the necessity of the removal of the parts, which are large and cumbersome, that such removal could be accomplished without tearing up the floor of the car or utterly dismantling or removing the motor. In order to effect these objects, the patent shows the motor casing in halves as it were and hinged together. The precise method of construction and operation, however, can best be shown by adopting in part the language of the specifications:

"As will be readily seen from the drawings, my motor is provided with a field-magnet which entirely incloses the armature and the two parts whereof are hinged together at the back, or at that portion removed from the axle

when suspended. The two parts of the field-magnet are shown at 1 and 2 and the hinge is shown at 3. This hinge is shown as depending from two strong lugs on the back of the upper field-magnet; but it is clear that any one skilled in the art may devise various forms of hinge adapted to this purpose.

"The forward end of the field-magnet is sleeved at 4 upon the axle, the upper or bearing half of the axle box or bearing 4, being cast in one piece with the upper portion of the field-magnet and the lower half being fastened thereto by means of bolts, 18, as shown, or by any other suitable means which will not be disturbed by or interfere with the independent movement of the field-magnet section 2 on its hinges.

"The field-magnets are provided with four poles (marked 5 in the drawings I), which are placed at an angle of about forty-five degrees to the horizon when the motors are in place. Each of these poles is appropriately wound, the windings in one half of the field-magnet being connected with those in the other half by means of a connection 6 sufficiently long to permit of the free opening of the motor.

"The two halves of the field-magnet are recessed at 7 and 8, as shown, for the purpose of receiving the bearings of the armature, one of these bearings being shown at 9. When the field-magnet is closed and the motor is in operative condition, the bearings, 9, are secured to both halves of said field-magnet, the bolts, 10, serving to fasten them to the upper half and the bolts, 11, to the lower half by means of proper threaded openings in the bearings, as shown in Fig. 2. It is evident from this form of construction that upon opening the field-magnet, as illustrated in Fig. 2, the bearings, 9, may be made to follow either the lower half or the upper half of the magnet or casing. If when the lower half is dropped, as shown, the bolts, 10, are unfastened, the bearings will follow the lower half and the poles and coils in the upper half of the field-magnet are open to inspection, as illustrated in Fig. 2. If, however, the lower bolts, 11, are loosened when the field-magnet is opened, the armature will remain with the upper half of the field-magnet and the lower poles and coils will be exposed. Thus the whole field-magnet may be got at without removing the armature from the car, and thus a great saving of time and trouble in repairs is attained."

In addition to the facility of inspection, and removal of the parts of the motor thus afforded, the patentee claims that he is thereby enabled to dispense with all framework, except such as is necessary for carrying the reduction gears, thereby among other advantages lessening the cost of construction. It should be noted, also, that the upper half of the field-magnet frame of his construction becomes the fixed or permanent half of the structure, and that the under half of the field-magnet hinged to it is entirely independent of the axle bearing and capable of being lowered at will without in any wise disturbing the upper half. Fig. 2 shows how, upon opening the field-magnet, the armature may as desired be kept attached either to the lower or upper half of the magnet. That is to say, if one bolt is removed, then the lower half may be dropped upon the hinge, and the armature lowered with that half, whereupon the upper poles and the coils of wire encircling them will be open for inspection. If, however, another bolt is removed, then when the field-magnet is opened upon its hinge, the armature will remain in the upper half of the field-magnet, and the lower poles and coils of wire will be exposed to view; so that, according as one bolt or another is removed, the armature, when the field-magnet is opened, will be found either in the upper or lower half as desired, and the poles and coils of wire of the other half open to observation. Moreover, this operation can be conveniently carried out

without removing or dismantling the motor simply by running the car over a pit, such as is commonly found between car tracks in the car yards or barns of trolley companies. The features of the patent which are claimed by the counsel of the complainant to be fundamental are concisely stated by them as follows:

"(1) That in his motor the field-magnet is made to inclose and protect the armature and itself to constitute the support for the armature bearings;

"(2) That the two halves of the field-magnet are hinged together, the upper half being the base or foundation of the whole and supporting the lower half, which may be swung downwardly from it on the hinge;

"(3) That the lower half is independent of the axle bearings upon which the upper half is sleeved and its dropping does not disturb the axle bearings; and

"(4) That means are provided whereby the armature may be supported by either the upper or the lower section, as may be desired, when the lower section is swung down."

And to show what can readily be accomplished in the way of inspection and removal of parts in dealing with the motor of the patent in suit, I quote, at the risk of repetition, a single passage from the testimony of one of the complainant's experts:

"A car equipped with the Schmid motor of the patent in suit can be merely rolled over a pit, and then a man in the pit can inspect or remove the lower field-magnet coils by merely dropping one edge of the lower shell, leaving the armature suspended in the upper shell. With no further manipulation, he can inspect the armature by rotating it to bring the different sides into view from underneath. By merely dropping down the lower half together with the armature, the field coils of the upper shell can be inspected and removed without the need of lifting out the heavy armature. As to the armature itself, it can be lowered part way together with the lower half of the field-magnet when it will come into a position where it can be easily and conveniently rolled out of its bearings in the lower shell and carried away. These operations can take place without the necessity of removing any of the dirty and heavy parts through the inside of the car."

The evidence shows the great utility of the patent in that from 80 to 90 per cent. of the motors constructed by the complainant company since 1894, approximately from 30,000 to 35,000, have been of this type. It is true that the evidence shows that some modifications thereof have been made, but the substantial features of the patent have been followed during that period by the complainant in the construction of by far the larger part of its electric motors of less than 75 horse power. The patent in question undoubtedly made a very considerable advance in the art. In entering upon an examination of the prior art, it may be said that of the numerous patents cited as anticipations of the one under consideration many are so obviously dissimilar that particular reference thereto seems unnecessary. Such only of them therefore as seem reasonably pertinent will be discussed. A prior patent to Schmid, No. 442,459, of 1890, for a double reduction motor, is no longer in use. It was of the open bipolar double reduction gear form of motor, and not of the closed type with single reduction gearing. Its magnet was of the horse-shoe style and essentially different from the two-part field-magnet of the patent in suit. Its upper section was not supported by the car truck, nor was its lower hinged to and supported by the upper section, nor was there any means provided whereby

the armature might be supported by either section when the lower section was swung downward. It had its foundation in a heavy rectangular frame surrounding the motor. The armature could be inspected but not removed from above, although from below it could both be inspected and removed, but to remove one of the field-magnets it was necessary to take the structure apart, an operation which consumed much time and labor. It is impossible to see how this patent can be considered as anticipating the construction of the patent in suit.

Still another patent to Schmid No. 498,577, of 1893, is cited. The fundamental structure of this motor likewise consists of a heavy rectangular framework outside of the motor wherein are provided bearings for the armature and also for the car axle. This framework, and not the car axle, supported the motor, and constituted one of the heavy and expensive appendages with which the patent in suit sought to dispense. The lower branch of the field-magnet, moreover, is not hinged to the upper half, as in the patent in suit, but to an outside framework, which framework is supported on the car truck. The upper field-magnet coils were accessible from the top by raising the upper half of the field-magnet shell, and the lower field-magnet coils were accessible from below, but the armature had to be dealt with separately and was only removable from underneath. Access to the motor, when in place, could only be had from above by means of a trapdoor in the car floor. In the Bassett patent, No. 457,102, of 1891, the upper part of the motor is rectangular in form and the lower semicircular. The motor casting was divided longitudinally through the centre. The two parts of the frame were hinged together, but the upper half could only be swung upwardly, and, unless the car body were first removed, the motor could only be gotten at through a trapdoor in the floor of the car. The motor was accessible from above, but not from below. Furthermore, it was the lower half of the motor which was supported on the truck, while the upper half was supported by the lower. It does not appear, certainly not clearly, that the lower section was hinged to and supported by the upper and adapted to swing downwardly as claimed by defendant's expert. Bassett, the patentee, was a witness for the defendant, and testified:

"That the motor was suspended from the bottom half of the field frame. The motor was therefore arranged to raise the upper half of the field frame through the trap in the car or to swing it up on the hinges. The armature could then be lifted out if desired."

It appears, moreover, that the lower section was not only not supported from the upper section and adapted to swing downwardly, but, if it were, there is apparently no means provided for holding the armature in the upper half while it was being done, nor, again, does either half of the frame appear to be independent of the axle bearings, as in the patent in suit.

The Blackwell patent, No. 470,817, of 1892, is radically different from the patent under consideration. It does not have a field-magnet constructed in two sections within the terms of the patent in suit. The armature is not supported from the upper but from the

lower pole piece, and, when that is removed, the armature drops with it. Furthermore, it has no hinge or swing movement, but, if opened for inspection or repair, the lower pole piece would have to be blocked up from beneath. It does not, and cannot without reconstruction, perform the function of the Schmid patent.

In the Mailloux patent, No. 457,357, of 1891, the motor is supported in a manner essentially different from that of the patent in suit. It has no hinge or hinge movement, and is therefore incapable of performing the swinging downward movement of that patent. There is no provision for retaining the armature in the upper section when the lower is removed. Moreover, the field-magnet is not composed of two parts. The complainant's expert says that of all the motors examined by him he finds this the most inaccessible and difficult to handle, and that it would be practically impossible to get out the upper field coils without a thorough dismantling of the structure.

The Bassett patent, No. 527,927, of 1894, is claimed by the complainant to be too late to be relevant in this case, but, waiving that, it is also essentially unlike the Schmid patent. The motor is supported by the lower half of the frame, and it is this which constitutes the foundation of the motor, while the upper half is the movable part. The motor is approached from above; that is, through the platform of the car, and not from below. No means is shown whereby, even if the lower half frame of the motor were capable of being swung downwardly, the armature could be supported in the upper half.

The Angell patent, No. 486,176, of 1892, is for a journal box intended to be used generally for shaftings. It provides no means for upholding the armature in the upper half of the journal, nor does it show a motor with a two-part field-magnet, the upper part of which is supported by the truck of the car and the lower part supported by, and hinged to, the upper part.

As already intimated, many other patents have been cited as anticipating one or another of the claims of the patent in suit. They are, however, all clearly and readily distinguishable from it, notwithstanding which they serve to show that the problem which Schmid overcame had long been recognized, and its solution attempted by workers in the art. None of them, however, accomplished it, certainly not in the simple and effective way in which it was accomplished by Schmid.

Another patent, No. 546,560, issued to Sidney H. Short September 17, 1895, for an electric locomotive, should, before leaving this branch of the case, be specifically mentioned. This is the second of the two patents in suit, and is claimed by the defendant to fully anticipate the Schmid patent. The complainant, while not admitting this, insists that it is immaterial because Schmid's invention was made some time before April 23, 1894, the date of the filing of the application for the Short patent. The Schmid patent was applied for May 10, 1894, and was issued, as already appears, August 30, 1898. Hence it will be seen that the Short patent has priority over Schmid, both in date of application and issue. Upon the proposition that Schmid made his invention prior to the filing of the Short application, the burden

of proof is upon the complainant, and the proposition itself must be established by clear and convincing testimony. Turning to the evidence supporting it, it will be found to consist in the testimony of several witnesses and in reference to, and extracts from, the books of the complainant, and other memoranda and documents. The proofs upon the point are of a character which cannot be intelligently abbreviated or summarized; hence nothing of that nature will be attempted. It is deemed sufficient to say that they are in kind and amount such as cannot be disregarded, and, in the absence of serious contradiction, must be considered as satisfactorily establishing the point to which they were directed, and this, notwithstanding the fact that Schmid himself was not called as a witness. This omission was criticised by defendant's counsel, but hardly with justice, since it appears that he has resided in France since 1897. In my judgment the evidence upon this point establishes that Schmid made his invention some time in the spring of 1892, and that a motor substantially embodying it was shipped from the complainant's factory on June 1st of that year.

I think upon the whole case that the Schmid patent is valid. It shows both utility and invention, and was not anticipated. Coming, then, to the question of infringement, I do not understand either from the brief or oral argument of defendant that this is denied. Nor was it denied by the defendant's expert. The defendant's motor has a field-magnet constructed in two sections and divided horizontally like the complainant's, the upper section of which is sleeved upon the axle at one end and supported by the car truck; while the lower section is supported by the upper and hinged to it at one end, and removably fastened thereto at the other independently of the axle bearing in such a manner that it may swing downwardly. Furthermore, the motor is provided with means whereby the armature may, at will, be supported in either section when the lower section is swung downwardly. The pole coils and armature are of the same type, and, in general, the motor is in all respects substantially like that covered by the claims in issue of the Schmid patent in suit. It seems unnecessary as this feature of the case is presented to discuss the matter in any greater detail than has already been done.

The only question remaining for consideration is whether the defendant is responsible for the infringement, inasmuch as the infringing motor was one of several manufactured by the Bullock Electric Manufacturing Company, which were installed on the cars of the Toledo, Port Clinton & Lakeside Railway Company in Ohio in 1904. It appears from the proofs, however, that the defendant in its own name, and by an advertisement paid for by it, advertised the infringing motor. There is also evidence showing that the motors manufactured by the Bullock Company, and supplied to the above-mentioned railroad company, were installed by men who worked under the direction of an engineer of the defendant company, and that payment for the equipment was made to the defendant. Again, it appears that the defendant has acquired the plant of the Bullock Company, and has since then paid all of the large bills of that company. There is ad-

ditional evidence which might be referred to were it necessary to establish the responsibility of the defendant for the acts of the Bullock Company. As to the claims in issue of the Schmid patent, the complainant is entitled to a decree.

There remains for consideration the Short patent, already referred to. It contains 19 claims, of which 3 only, namely 7, 8, and 15, are relied on. They are as follows:

"7. The combination with a motor casing constructed with end trunnions, said casing and trunnions being divided or formed in detachable sections, of a hook formed in one section of the casing, a perforated lug on the other section, and an eye bolt for connecting together such sections and forming a hinged joint between them, substantially as set forth.

"8. The combination with a two-part motor casing, one part having an upturned hook cast on one side and perforated lugs on the opposite ends, the other parts having perforated lugs cast on its ends, and on one side, of an eye bolt for connecting the adjacent parts of the casing, and bolts for securing their ends, substantially as set forth."

"15. The combination with the divided motor casing having divided trunnions formed on its opposite ends, of journal bearings encircling the journals on the armature shaft, and means for detachably securing the journal bearings to the upper sections of the divided trunnions, substantially as set forth."

The claims involved deal chiefly with the particular form of hinge and the particular means provided for supporting the armature in the upper section of the field-magnet when the lower section is dropped. So far as the form of hinge is concerned, Short simply adopted and used an old form of hinge which after all was little more than a hook and eye. Schmid in the patent already considered, after speaking of his particular form of hinge, says:

"But it is clear that any one skilled in the art may devise various forms of hinge adapted to this purpose."

The main feature of this hinge is in its mechanical form. Its function is purely mechanical. I fail to see that it is adopted and used in a way that involves anything in the nature of invention. As to the trunnions and perforated lugs specifically mentioned in the claims in issue, and relied upon to show invention, it is unnecessary to pass upon them, notwithstanding their validity is seriously attacked; for the reason that the defendant's device does not have these elements or any equivalent thereof. The claims in question have not therefore been infringed. My views accord with those of the defendant's expert on this portion of the case. The defendant's structure does not show any trunnions or their equivalent, having the function of the trunnions of the Short patent, and the same may be said of the perforated lugs. The defendant's device has no lugs.

As to this patent, the bill will be dismissed. The costs will be divided between the parties.